Good morning, Your Honor. Robert Crockett for Japanese Village. Your Honors, members of the panel. With me is counsel for the Bonaventure, and we'll be splitting our time. I'd like to address two small matters which explain, which sort of lead into larger matters, and that's the two attempts that the FTA made to correct and improve the record. The first one was in response to our request for judicial notice. We asked only that the court take judicial notice of the MTA's website, showing that they hadn't included mitigation measures for my client. In response, they produced a declaration of Leslie Rogers, who signed the original record of decision, and he submits a full-blown declaration explaining that he reviewed the mitigation monitoring plan, the MMRP, and it should have been attached to the record. It wasn't, and he signs it, but he signs it under, he signs it on information and belief, which is contrary to 28 U.S.C. 1746 and contrary to authority in this court. The second attempt the FTA made to correct the record was they, in February, they filed this document, which is a corrected final environmental impact statement and a corrected ROD, record of decision. But the problem with this particular document is that when the FEIS, the corrected FEIS, refers to Japanese, the mitigation measures that should have been in place for Japanese millies, all they did is just copy the old mitigation measures. So they didn't correct anything in the FEIS. The mitigation measures at 4.4.7 in this corrected document are the old mitigation measures. Now, what they did is they did drop in mitigation measures into the corrected MMRP, which is an attachment, but this leads to the larger problem. The larger problem is that they didn't do any analysis of the mitigation measures that their engineers recommended, that MTA staff promised to add, and that they finally attempted to add in this year. So even though they attempted to add mitigation measures for noise and vibration, subsidence and parking, there's no analysis of those newly added mitigation measures anywhere in the old FEIS and the new FEIS. Just nowhere. And that's the problem with this case. I know it's an important case. I know that this transportation system is important for the area. Big transportation systems are important. I fully understand and realize that. But NEPA is pretty clear. NEPA requires them to fully analyze every mitigation measure. There's got to be a detailed discussion of mitigation measures, and they have to explain why they're not adopting a particular mitigation measure. And for noise and vibration, their experts said, look, you've got... The mitigation measures we recommend aren't enough, but we recommend relocating the residence, which we say is not a mitigation measure, and we recommend meetings and notice. And then they've recommended an engineering solution. Those three were not enough, they said, but the MTA only adopted two of them, and their FEIS says that's enough. There's no bridging the gap between their experts saying it's not enough and the FEIS' statement saying it is enough. And their engineers say, the only way you're going to be able to mitigate noise and vibration from long term rail at Little Tokyo is you're going to have to install this particular technology, IST. The FEIS doesn't do it. There's no analysis as to why it wasn't done. And their papers, their curative papers don't address it either. What's the relief that you think is appropriate? The relief we're asking that this matter be remanded to the district court to instruct the FTA to cease funding and supporting the project until these analytical problems are corrected. That's the relief. But you didn't ask for this relief in the district court. That's the relief we asked for. No, you didn't... The request for judicial notice of the MMRP, you didn't make that request in the district court, did you? The particular issue that Your Honor is focusing on is, I believe, is... Is there a yes or no? Did you... I don't understand the question. I think the... Mike, my question is in response to your response to Judge White's question, which is you want a remand, but you didn't ask for this in the first place before the district court. We asked the district court to cease... To tell the MTA to cease instructing, to cease supporting this until the FEIS is corrected. That's what we asked for. Well, okay. I thought you were addressing your motion for judicial notice. No, the judicial notice issue was just... You're correct. We did not point out to the district court that the MMRP was not attached to the rod. You are correct. Your Honor is correct. And we note that in both of our briefs. And we point out that our position is that not the tech... Our problem is not with the technical failure to attach the rod. It's the failure to undertake any kind of analysis of the mitigation measures, which should have been done. You're talking about... Let me... Just help me understand exactly which argument you're talking about. You're talking about the argument that because not all of the mitigation measures were set forth in the FEIS, and that the MMRP contemplates maybe additional mitigation measures as they become necessary, that the whole thing is defective under NEPA. Is that the argument? Not quite. The argument is that the mitigation measures that are now in the corrective MMRP are nowhere discussed in the FEIS. Okay, but wasn't it... Okay. Okay. I'm not following that argument. Okay. So, Your Honor, the... I mean, the import. What's the import of that argument? The import is that there is a failure of analysis in informing the public and decision makers as to the range of mitigation measures available to the mitigation... to the decision makers when they approve this project. The engineers said the only... the only applicable mitigation measure to defray or reduce long-term noise and vibration is this IST technology. Nowhere in the FEIS does that appear. Nowhere in the corrective FEIS does that appear. There's got to be an analysis of that, and they can't just I'd like to defer... That goes to the subsidence issue? That goes to noise and vibration, long-term operational. Well, my point goes to all four issues, all three issues. Noise and vibration, noise and vibration long-term, and subsidence and parking. Okay. Well, I have you here, though. You just filed a stay... Yes, Your Honor. ...at the whole construction pending what? We asked for a stay, and the stay that we're asking for is not a stay of the entire project. We're asking that the... that no impact be had upon the Japanese village, the Little Tokyo portion of the project, until the analysis has been completed. But now, in your motion, you ask for analysis of heaving? In our motion, we're saying that there's a heave problem. If this project is permitted to proceed, there will be heave damage at a Japanese village. And what is heave? Heave is when they're about to inject cement grout underneath Japanese village. Which is one of the mitigations, right? It's one of the mitigations. That's correct. That's an irretrievable commitment of resources that will lead to moving Japanese village up. That will and can lead to damage. And I had to seek a stay. If I hadn't sought a stay, I could be accused of letting this thing get moot. But have you raised that one before, the claim about heaving? Because that's the first time I heard about heave. Yes, Your Honor. Our concern is with the irretrievable commitment of resources. This is the first major invasion of Japanese villages property for the project. It's the injection of grout. So our concern is with the irretrievable commitment of resources. We didn't raise heave below, but if their first foray into our project was to start with tunneling, well, we would object to that. Or if it was the insertion of some big device, we would object to that. That would be an irretrievable commitment of resources. It's just that grouting is the first thing. That's why we sought to stay. Okay. So nothing wrong with grouting in itself? Well, we dispute that. No, Your Honor. Grouting... In our subsidence argument, we argued that the engineers recommended that grouting be commenced upon the detection of one quarter inch subsidence at Japanese village, and they abandoned that mitigation measure for less definitive studies. And we argued that they should have adopted that particular mitigation measure instead of abandoning it. They should have at least discussed why they abandoned that mitigation measure. So, yes, we did discuss grouting below. Thank you, Your Honor. May it please the Court. Christopher Sutton, appearing for the Bonaventure Hotel, which is the business name for today's 4 Inc. and the related case. I just wanna quickly emphasize that the District Court, in terms of our end of the project, which is the environmental analysis of the tunneling on Flower Street was not included in the EIS, and that was the basis for the partial injunction. And we just don't think the Court went far enough, because if the secret analysis defines the project and the alternatives, all of the other measures related to the environment were never adequately analyzed. What is the state of that? He remanded back to the And then they did an abbreviated environmental document, and the Court found them in compliance with the injunction in January of this year. So there was a 15-month injunction, partial injunction in place, just for the Flower Street portion. Now, are you appealing that one, too? No, that is outside the record of this decision. I mean, not in this appeal, but did you file a notice of appeal from that portion? No, we did not. Okay. No, we did not. The Court should remand and order the full environmental analysis of all of the impacts that we've identified in our briefs. And I'll reserve the balance of my time. Good morning. May it please the Court, my name is Erica Kranz. I represent the federal defendants in this case. With me at Council's table is Minming Mori for the FTA, and Tiffany Wright for the Los Angeles County Metropolitan Transportation Administration, I'm sorry, Authority. If questions come up that particularly pertain to Metro, Ms. Wright is here and available to answer them, but I'm not specifically reserving time for her. The Regional Connector will add a critical missing link to Los Angeles' public transportation system and will allow a one-seat ride across the county. This increased connectivity will serve thousands of Metro riders, it'll add new stations, decrease transfers, improve air quality, and reduce traffic congestions, and move those transit customers efficiently through one of the densest parts of Los Angeles. Now, of course, constructing this 1.9 mile line is not going to be without temporary annoyance, especially to some businesses along the line. But in compliance with NEPA, which is a procedural statute, FTA and Metro worked jointly to study the project, they disclosed potential effects, they discussed mitigation available to mitigate them, and that complies with NEPA's procedural mandates. They took a hard look at this project's effects. Now, these two plaintiffs have been extremely engaged in this NEPA process, but they've now raised a host of issues, and we've heard about just a few of them this morning. The agencies acted reasonably at each step of their process. They considered information before them at the time, they worked to improve their mitigation as the project design progressed, they've engaged with stakeholders, including these plaintiffs, and they've designed mitigation measures that are flexible to adapt as Metro encounters the on-the-ground realities in this case. This complies with NEPA's procedural mandates. What about the Japanese Village Council's argument that your engineers found that certain mitigation measures would be necessary, and that the EIS doesn't comment on those? Right, so I believe he's referring to the isolated slab track technology, which is a mitigation measure available to mitigate operational noise and vibration effects. Is that the same as compensation grouting? No. Because I thought they were referring to that too, because there was an expert report after the FEIS was issued, but before the R.O.D. on that. Well, I suppose you could look at this in terms of both the noise issue and the compensation grouting issue. As for the noise issue, there was a 2011 expert report that suggested that probably this other technology would be adequate to mitigate operational noise. The agencies at that point developed mitigation, it's NV29, that suggests using that technology, but also leaves open the possibility of using other appropriate measures as needed to eliminate impacts and reduce ground borne noise below FTA's annoyance criteria. So they certainly weren't closing the door to other technologies being used. And when the 2012 expert report came out, suggesting that isolated slab track technology would be necessary to reduce operational noise, Metro then adopted that as part of the mitigation plan. This is exactly how the mitigation is supposed to work, is as we get more information, we make modifications and respond to that new information. As for the subsidence, Japanese Village is claiming today that the expert made some certain recommendations and then the agencies have now abandoned those recommendations. That's absolutely not correct. The mitigation plan incorporates the recommendations about taking baseline measurements, setting specific thresholds for how much movement is acceptable, and then using these very sensitive measuring devices to detect that movement. And of course, using grouting, both in advance of construction and during construction, to keep that movement within the acceptable range. Your questions about Japanese Village's motions about heave, they absolutely haven't raised this heave issue before. For what it's worth, the expert's report does talk about how a pre-construction phase of grouting, that's actually how the contractor can tell if the grouting is working or not, if they've done enough. There's a tiny, just measurable amount of heave, and then they say, okay, we're done. We've solidified the soil well enough that tunneling could commence. But no, I... That's what it's about. Is that the stage that we're about to enter? So actually, some grouting has been done since April. There's two different types of grouting. There's permeation grouting and then compensation grouting. Permeation grouting has been underway for several months now. Compensation grouting is about to start. And that's what they appear to be concerned about. But you can see... And you oppose the stay, I take it? The request for a stay? We followed our opposition on Friday. And what's your ground for opposing it? Well, first, likelihood of success in the merits. This new heave theory, there's strong Ninth Circuit law saying that you can't get a stay on grounds that are unrelated to the merits of your appeal, which this heave is. And also, Metro filed some declarations talking about the harm, the extreme cost of delay. We think the balance of equities here tips very strongly in the agency's favor. Again, if grouting is the harm that they're worried about, we have these measures in place to make sure that the subsidence or heave is going to be within these narrow acceptable thresholds. And as for noise, we have measures in place as well to make sure that the people affected by the construction noise at Japanese Village may be relocated if they wish, so that they don't have to experience the annoyance of a sound around the annoying level of an air conditioner. So we simply don't... We believe that those harms, to the extent they could be harms, don't outweigh the harms to the government delaying this project. Is the question of a stay on call or is it the judge's call? So Japanese Village did initially file a motion for a stay in the district court. Just a couple of weeks ago, the district court set a schedule for briefing that motion that Japanese Village did not prefer, and so they've now withdrawn that motion and come to you. Normally, Federal Rule of Appellate Procedure 8 does say that they have to go to the district court first, but they've decided that they think this is enough of an emergency that they have come straight to the circuit. Their position is that they couldn't get a stay in sufficient time from... That is their argument, but of course, they've known that this grouting was gonna begin for several months now, and they have just waited until now to file their motion. There may be an easy answer to this, and I just don't know, but is there a bonding requirement? That, I don't know. Outside my area of expertise. Let me ask you about the parking situation in Japanese Village. Yes. Does the record reflect any attempt to measure the future parking capacity of the garage and the impact on whether there's any increase or decrease in the future parking availability? There was not a specific study about long term parking effects on Japanese Village in particular. What the record says is that this kind of new transit project, where it's in an urban environment, they simply don't expect it to draw additional parking to the... Or drivers to the area that will need parking, because it's going to, of course, provide a way for people to come to this area without driving. So the record, in a couple of places, talk about how this increased transit access is going to help relieve parking or offset parking loss. That's at JVEX 195.1. There's also some discussion about it in the... Attached to the RAW, there were some 452. Japanese Village points to a NEPA analysis done for another project, saying, look, you did all this parking analysis for this other project, why didn't you do it for us? If you actually look at that analysis, it reaches just the same conclusion about the more urban downtown stations, that there simply aren't expected to be parking effects at downtown stations. But isn't there... That there's gonna be a place where people can get on and off the train in the fishing village, not fishing, Japanese Village. And so what about people who wanna park their cars at that station? Right, there actually already is another station right there near Japanese Village. But what the agencies are saying here is that this isn't like a neighborhood transit station or a park and ride type transit station. This is an urban station, people are going to be coming to it on the train. They're not so much going to be driving there and then getting on the train to go somewhere else. Is that in the record? Is there an explanation of why they didn't analyze it? The explanation talks about the increased access, increased transit access, meaning less need for parking. And that's the JVACS 195.1 and AEX 452. But the record also talks about these other things that are gonna help offset parking needs. It talks about the new development coming that's gonna have all this public parking. It talks about improvements for facilities for pedestrians and cyclists. And it talks about there being a metro property that is, after it's done being used for construction, can be used for parking, at least for a while. The other thing is, the record notes that parking, like the parking that's being lost, is traditionally thought of as a transient land use. It's not something you can necessarily count on being around forever anyway, because those types of things tend to be developed into more profitable developments. I'd like to turn to Bonaventure, I suppose, for a few minutes. They've mostly pointed to the tunneling issue in their brief comments. First, I wanna point out that the tunneling issue that the district court being mandated is not the tunneling issue that's on appeal here. There are two separate construction methods. The tunneling issue that's on here is the use of a closed face tunnel boring machine and whether it can be extended just one block farther. Metro studied this at several different points in the record as different facets of the project changed that could allow more flexibility in construction method. Metro continued to reevaluate and see, can we extend it, recognizing that tunneling does have fewer effects on neighboring properties than cut and cover construction. They were able to extend tunneling two blocks farther south at one point. Bonaventure wants them to extend another block farther south. The tunneling experts have studied it and said, it's potentially possible, but it would require further study of cost, risks, schedule, and design changes, some of which were gonna be significant. And later, Metro's board voted to do that extension by one block if it did turn out to be feasible. Now, this isn't technically on appeal before you, but the agencies have now done supplemental analysis. They voluntarily considered this issue even more, and that analysis did conclude that considering all the risks, costs, construction delay associated with this one block farther, and actually increased burden on Little Tokyo, because the bored material would have to be taken back through the tunnel and it will exit the tunnel at Little Tokyo. They determined that it simply wasn't feasible as a matter of sound public policy. So to the extent you did agree with Bonaventure that there hadn't been enough analysis, there's now been a whole lot more analysis now, and there would really be no reason for a remand. If you don't have any further questions, I'm happy to submit. Thank you, Council. In terms of Bonaventure, the analysis that they did was limited to the shallow alignment. The analysis they did not do, and that the district court should have ordered, was that the alignment, the depth of the tunnel would provide for additional block of tunneling. And the reason for that is there is a certain area of alluvium, and then there's a certain area of bedrock. If they would lower the tunnel slightly, the tunnel boring machine would be able to go through the bedrock, the one block past the Bonaventure to Fifth Street. And it's that one block analysis either between open face tunneling or closed face tunneling, but they did not analyze the lower alignment that we pointed out in our brief. It's the lower alignment that allows them to go the extra block, not whether or not one method or another is viable at the higher, shallow area. This train, the way they've designed it, is a roller coaster. It comes in at Little Tokyo, it then comes past the LA Times, goes up and comes down in excess of national standards. If the tunnel would simply stay level, it would be faster to build, cheaper to build, safer to build, and quieter to operate. That's the analysis they didn't take, is that the level, the lower level alignment is the one they did not analyze, that the court should have ordered them to analyze, along with everything else that would have come from that, the access, the nighttime glare and noise at the hotel. We are not seeking an order to stop this project. We are seeking an order to them to postpone what they're doing at this one location, the Japanese village at their one location. The rest of this alignment is not in dispute. If the court remands to the district court and orders the further analysis, the project will not be delayed because they're not gonna start tunneling for another six or seven months. And then they can change what they're doing at that point in time. Aren't they doing stuff right now in front of the Bonaventure? They are doing pre-tunneling preparation. They are doing... They're dropping pilings. They're doing utility relocation. But the tunneling past the Bonaventure is not gonna start for a long time because the tunneling has to start in Japanese village. It then moves slowly along the route, eventually gets to South Flower Street. They then pick up the machine, take it back to Little Tokyo and do the second tunnel so that... Well, then why wasn't there time for the district court to decide that question? Excuse me, Your Honor? I said, why wasn't there time for the district court to decide that question? Well, the court, we believe, abused its discretion in not ordering a full analysis of tunneling on Flower Street. If the court, once it acknowledged that the original analysis was non-public, was secret, therefore, the court needed to say, do a full supplemental environmental document. Instead, the district court left to the discretion of the local agency the scope of which they were gonna analyze. And so that when they came back to the district court for compliance, they complied with the limited order that the district court entered. And we believe the limited order is the abuse of discretion because once they found a... Once the court found a violation of NEPA, it should have said, you can't say that your analysis on noise and night time and grade separation and access is complete unless you do a complete analysis of the lower alignment of tunneling, which eliminates all those impacts. That's the reason we think that the court should remand. I'm gonna give Mr. Crockett time on his rebuttal. Thank you, Mr. Panel. Let me just be clear on the stay issue. Grouting is challenged, grouting before. We didn't complain about heave before. All we're saying now is that this is the first thing that's going to happen in the project on Japanese Village where there's an irretrievable commitment of resources. Grouting and heave, that's why the stay was asked for. Has nothing to do with what we challenged or didn't challenge below. We're saying if we wait any longer, they're gonna start injecting cement on the Japanese Village. The grouting, it's not permeation grouting, it's just chemicals. The grouting that they're going to start this week is cement. And we tried to go to the district court. The district court, the parties, we all agreed to a hearing the second week of August. The district court set it for middle of September. I felt I had no choice but to withdraw that motion and come here. I considered that an essential denial of our motion. Council stated the following, Metro adopted IST as part of the plan. That is not true. Nowhere is that in the record. We point that out in our brief, that IST has never been adopted by Metro. The FDA has submitted this revised MMRP, but Metro has not adopted it. It's not been adopted. Metro has, FDA has talked about parking. It is not true that there are studies anywhere in the record. Let's see, let me make it straight. There are no studies anywhere in the record that discuss spillover parking impacts upon Little Tokyo. It's not just our parking structure that's 16 feet away from the station. It's all the parking structures in Little Tokyo. The EIS says, well, the parking, the private parking structures can simply take up the slack. That's not an acceptable mitigation measure, certainly not to my client. It'll find its parking structure filled with cars before its tenants arrive in the morning to start work. How do you know that? We have a parking study in the record, Pat Gibson. We supplied it. It's in our FDA also says, well, you don't need local parking structures because increased transit is going to offset the need for parking. No studies anywhere in the record support that. They just say it. They just, there's one paragraph, they just say it. And in fact, we point out in our briefing that elsewhere down the line on one of their other projects in an urban environment, they had to beef up the archdiocese parking structure adjacent to a station because of the very problem that we're talking about. And finally, one last thing, it's on the noise and vibration issue. They admit in their papers, which we point out in our reply, that they exceed federal guidelines, federal standards, federal thresholds. They admit that they have done that. Nowhere in the record do they explain why they've chosen to proceed with the project, given those exceedances, and why it's necessary to proceed. They're entitled to ignore threshold exceedances, but they have to have a reason as to why they're doing it. Nowhere in the record is that found. Instead, we have post hoc rationalization coming from briefing, explaining why this is being done. And we hear about that, a little about that today. And we've heard that in the express the remand order you would like to see. The remand order would be to number one, ask or instruct the district court to select the appropriate remedy to address the court's decision on the inadequacy of the of the E. I. S. Act. Number two, to direct the district court to restrain the irretrievable commitment of resources to Japanese village, and I assume Bonaventure, until the revised studies are finished. That's what we'd like. When you say irretrievable commitment of resources, are you talking about public resources, metro resources? Yes. Publicly funded, federally funded resources, such as I would leave that up to the district court to figure out what that is. But I would tell the district court it would be tunneling and grouting. They shouldn't be doing any of that without completing these studies. Can the district court require a bond? You know, that's a great question, and I don't know what a bond would be, a $10 million bond, and then the project could proceed. Does that solve anything? Does that permit? That just permits the project to be completed and the studies to be done afterwards. That doesn't give the agencies the opportunity to say, oh, well, based upon this analysis, we have found a better solution here. That's what we're saying they should do. So I'm not sure a bond would really help out here, nor have I ever heard of a bond being done in a federal transportation project like this. Thank you. Thank you, Councilor. The case disargued will be
judges: Reinhardt, Wardlaw, Whyte